1

2

3

4                              UNITED STATES DISTRICT COURT

5                                    DISTRICT OF NEVADA

6    JIM BASS HOLDEN,                              Case No. 3:16-cv-00064-MMD-WGC

7                                    Plaintiff,    **REPORT & RECOMMENDATION OF**
                                                  **U.S. MAGISTRATE JUDGE**
8            v.

9    STATE OF NEVADA EX REL
     NEVADA DEPARTMENT OF
10   CORRECTIONS, et. al.

11                                   Defendants.

12          This Report and Recommendation is made to the Honorable Miranda M. Du, United States

13   District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C.

14   § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

15          Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 78, 78-1 to 78-

16   8, ECF No. 80.) Plaintiff, who is represented by counsel, filed a response. (ECF No. 84.)

17   Defendants filed a reply. (ECF Nos. 85, 85-1 to 85-3.)

18          After a thorough review, it is recommended that Defendants' motion be granted in part,

19   and denied in part.

20                                          **I. BACKGROUND**

21          Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC),

22   proceeding with this action pursuant to 42 U.S.C. § 1983. He filed an original and amended

23   complaint pro se, and then became represented by counsel and was granted leave to file a Second

24   Amended Complaint (SAC). (ECF Nos. 58, 59.) The events giving rise to this action took place

25   while Plaintiff was housed at High Desert State Prison (HDSP) and Lovelock Correctional Center

26   (LCC).

27          The defendants named in the SAC are: HDSP Warden Dwight Neven, HDSP Associate

28   Warden Timothy Filson, NDOC Director James G. Cox, NDOC Deputy Director E.K. McDaniel,

HDSP Associate Warden Isidro Baca, HDSP Associate Warden Bruce D. Stroud, HDSP Associate Warden Jennifer S. Nash, HDSP Associate Warden Cole T. Morrow, HDSP Associate Warden Jerry L. Howell, HDSP Associate Warden Harold J. Wickham, HDSP Associate Warden James S. Henson, Commissioner on the Nevada Board of State Prison Commissioners (NBPC) Brian Sandoval (official capacity only), NBPC Commissioner Barbara Cegavske (official capacity only), NBPC Commissioner Adam Laxalt (official capacity only), NDOC Medical Director R. Bruce Bannister, NDOC Senior Physician and/or NDOC Medical Director Romeo Aranas, NDOC Physician James E. Holmes, NDOC Physician Ted D. Hanf, NDOC Physician David Hipkin, and NDOC Physician William Donnelly. All defendants are sued in their individual and official capacities unless otherwise noted.

The order granting Plaintiff leave to file the SAC, ordered the Attorney General's Office to file a notice advising whether it would accept service on behalf of the defendants named in the SAC. (ECF No. 57.) If it did not accept service for any of the defendants named in the SAC, it was to file the last known address under seal (and not serve the inmate plaintiff). (*Id*.) If service was not accepted for any of the defendants named in the SAC, Plaintiff was directed to file a motion identifying the unserved defendants and request the issuance of summonses and service of the summonses and complaint. (*Id*.)

At a September 25, 2017 status conference, the court again directed the Deputy Attorney General to advise regarding which defendants from the SAC for whom the Attorney General's Office would be accepting service. (ECF No. 63.)

On September 28, 2017, the Attorney General's Office filed a notice indicated it accepted service on behalf of Isidro Baca, Jennifer S. Nash, Jerry L. Howell, Brian Sandoval, Harold J. Wickham, Adam Laxalt, (ECF No. 61.)

The Attorney General's Office did not accept service for Cegavske, Henson, Hipkin, Morrow or Stroud. (*Id*.) Plaintiff did not file a motion identifying these defendants or requesting he court to issue a summons for them, or have them served with the summons and complaint.

While these defendants would normally be dismissed without prejudice under Federal Rule of Civil Procedure 4(m), there are additional circumstances that warrant dismissal with prejudice.

A suggestion of death was filed as to Stroud on September 20, 2017. (ECF No. 60.) Even though Plaintiff could conceivably pursue his claims against Stroud in his official capacity pursuant to Rule 25(d), Stroud should be dismissed with prejudice because the court has found, *infra,* that Plaintiff failed to exhaust administrative remedies with respect to all claims asserted against Stroud.

In addition, the court finds, *infra,* that Plaintiff failed to exhaust his administrative remedies with respect to all claims asserted against Cegavske, Henson Hipkin, and Morrow, so their dismissal should also be with prejudice.

The Attorney General's Office made no mention of the status of service with respect to the remaining defendants named in the SAC in its notice of acceptance of service: Neven, Filson, Cox, McDaniel, Bannister, Aranas, Holmes, Hanf, Hipkin, or Donnelly. With respect to Aranas, Bannister, Cox, Donnelly, Filson, Hanf, McDaniel, and Neven, the court presumes this was an oversight because it had represented these defendants with respect to the First Amended Complaint. In addition, the pending motion for summary judgment was filed on behalf of Aranas, Bannister, Cox, Donnelly, Filson, Hanf, McDaniel, and Neven. The court will treat this filing as the entry of an appearance on behalf of those defendants.

The docket does not indicate representation by the Attorney General's Office for Holmes. Even though the Attorney General's Office seemingly does not represent Holmes, it has moved for summary judgment on his behalf. (*See* ECF No. 58 at 18.) Plaintiff went forward with serving Holmes with the *First Amended Complaint* by publication (*see* ECF Nos. 30, 31, 38, 44), but there is no record of Holmes ever filing a responsive pleading or otherwise appearing in the case. In any event, the docket does not indicate Holmes was ever served with the SAC.

Plaintiff did not timely serve defendant Holmes with the SAC; therefore, he should be also dismissed without prejudice pursuant to Federal Rule of Civil Procedure Rule 4(m) unless Plaintiff files a motion to extend the time for service demonstrating good cause for the failure to timely serve.

The motion for summary judgment also lists Pamela Del Porto and Charles Schardin as defendants, even though they are not named in the SAC. The court will disregard this reference.

The SAC asserts violations of the Eighth Amendment to the United States Constitution as well as the Nevada Constitution for alleged deliberate indifference to his health, safety and serious medical needs based on allegations that he is fair-skinned and was placed in administrative segregation (ad-seg) at HDSP, and his access to recreation time was in an exposed steel cage with no protection from the sun's harmful rays, which regularly exceed 100 degrees in the spring and summer months when he was housed there from March 9, 2011 through May 9, 2012, and again from April 10, 2013 through October 24, 2013.

He alleges he was denied access to sunscreen from the prison's store on the basis that squeeze-bottle products such as sunscreen were not permitted to be sold in ad-seg units. He was also denied sunscreen by NDOC's medical department, telling him he had to purchase it from the prison store, which had already denied him the purchase. He claims that the failure to provide any protection from the sun, either by way of a covering or provision of sunscreen, was a result of various prison policies. In addition, he avers he attempted to seek medical treatment for changing moles, freckles and skin lesions for approximately four years, starting in June 2011. He contends that even when prison officials knew some of his lesions were cancerous, they refused to look at other skin lesions or order biopsies to determine whether they were cancerous and required removal, or otherwise provide proper treatment for his skin condition.

Defendants move for summary judgment, arguing: (1) Plaintiff did not exhaust his administrative remedies before bringing suit; (2) that they are entitled to summary judgment with respect to the deliberate indifference claims in Counts IV-VIII; and (3) that they are entitled to qualified immunity.

## II. DISCUSSION

### A. Exhaustion

Defendants argue that Plaintiff failed to timely or properly exhaust his administrative remedies in conformity with Administrative Regulation (AR) 740 before filing suit.

#### 1. Exhaustion Requirement

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The failure to exhaust administrative remedies is "'an affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007)), *cert. denied*, 135 S.Ct. 403 (Oct. 20, 2014). Unless the failure to exhaust is clear from the face of the complaint, the defense must be raised in a motion for summary judgment. *See id.*, *overruling in part, Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003) (which stated that failure to exhaust should be raised in an "unenumerated Rule 12(b) motion").

"If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts [in a preliminary proceeding]." *Id.*, 1168, 1170-71 (citations omitted). "Exhaustion should be decided, if feasible, before reaching the merits of a prisoner's claim. If discovery is appropriate, the district court may in its discretion limit discovery to evidence concerning exhaustion, leaving until later—if it becomes necessary—discovery related to the merits of the suit." *Id*. at 1170 (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)). If there are disputed factual questions, they "should be decided at the very beginning of the litigation." *Id*. at 1171.

Once a defendant shows that the plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id*. at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)); *Draper v. Rosario*, 836 F.3d 1072, 1080 (9th Cir. 2016) (inmate plaintiff did not meet his burden when he failed to identify any actions prison staff took that impeded his ability to exhaust his administrative remedies, or otherwise explain why he failed to comply with the

administrative remedies process). The ultimate burden of proof, however, remains with the defendant. *Id.*

The Supreme Court has clarified that exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "Proper exhaustion" refers to "using all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id.* (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis original). Thus, "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison grievance process but also to adhere to the 'critical procedural rules' of that process." *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). That being said, an inmate exhausts available administrative remedies "under the PLRA despite failing to comply with a procedural rule if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process." *Reyes*, 810 F.3d at 658.

To reiterate, an inmate need only exhaust "available" administrative remedies. *See Ross v. Blake*, 136 S.Ct.1850, 1858 (2016). That is, "those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 738).

**2. NDOC's Grievance Process**

NDOC's grievance process is set forth in AR 740.

Preliminarily, the court will address Plaintiff's argument that Defendants' motion should be denied because they refer to a version of AR 740 that was not in effect at the time he submitted his informal grievance. In their reply brief, Defendants include a copy of AR 740 in effect from February 12, 2010 to June 15, 2014 (ECF No. 85-1), a version in effect from June 16, 2014 to September 15, 2014 (ECF No. 85-2), and a version in effect from September 16, 2014 to January 2, 2017 (ECF No. 85-3). These three versions were in effect during the time Plaintiff alleges his rights were violated in the SAC. The court agrees with Defendants the versions are

1    substantially similar; therefore, the failure to submit all three versions with the motion is

2    immaterial.

3        Each version of AR 740 requires an inmate to complete three grievance levels for

4    exhaustion to be considered complete: the informal, first and second levels. (ECF No. 85-1, ECF

5    No. 85-2, ECF No. 85-3.) Each version of AR 740 requires an informal level grievance to be

6    submitted within six months of the wrong alleged. (ECF No. 85-1 at 6, AR 740.05.4.A;

7    ECF No. 85-2 at 6, AR 740.05.4.A; ECF No. 85-3 at 6, AR 740.05.5.A.) The failure to submit a

8    proper informal grievance within the time frame constitutes abandonment of the grievance at that,

9    and all subsequent levels. (ECF No. 85-1 at 6, AR 740.05.8; ECF No. 85-2 at 7, AR 740.05.8; ECF

10   No. 85-3 at 7, AR 740.05.8.) All documentation and factual allegations available to the inmate

11   must be submitted at the *informal level*. (ECF No. 85-1 at 6, AR 740.05.5.A.; ECF No. 85-2 at 7,

12   AR 740.05.5.A; ECF No. 85-3 at 7, AR 740.05.5.A.)

13   **3. Plaintiff Was Required to Exhaust Administrative Remedies Even Though He**

14   **Ultimately Retained Counsel to Represent him in this Litigation and is Untrained in the**

15   **Law**

16       The court will first address general arguments raised in Plaintiff's response to Defendants'

17   exhaustion defense. Plaintiff argues that he should be excused from exhausting administrative

18   remedies under the PLRA because he is represented by counsel. Within this argument, he asserts

19   a sub-argument that prisoners should be excused from timely exhausting their claims because they

20   are laymen, untrained in the law and unable to recognize issues and claims. Plaintiff asserts it is

21   "arguable" that the grievance system is effectively unavailable when an inmate is intellectually

22   unable to recognize issues and claims so that he does not grieve those issues. He claims that an

23   attorney may subsequently discover and develop issues, when the time to grieve them has already

24   expired.

25       There is simply no legal support for Plaintiff's argument that he is somehow excused

26   from exhausting administrative remedies because he is untrained in the law and later retained an

27   attorney to represent him. If accepted, Plaintiff's argument would create a complete end-run

28   around the PLRA for represented inmate litigants, and really for almost all inmate litigants who

1   are untrained in the law.

2       The language of the PLRA bears repeating here: "*No action* shall be brought with respect

3   to prison conditions under section 1983 of this title, or any other Federal law, *by a prisoner*

4   confined in any jail, prison, or other correctional facility *until such administrative remedies as are*

5   *available are exhausted*." 42 U.S.C. § 1997e(a) (emphasis added).

6       Plaintiff argues that the PLRA requires the court to screen actions *brought by prisoners*,

7   and reasons that when an attorney files an action on behalf of a prisoner, the PLRA's exhaustion

8   requirement is not triggered.

9       The fact that the action is technically *filed* by counsel, does not change the fact that it is

10  being filed by counsel *on behalf of the prisoner*; therefore, the action is still being filed *by a*

11  *prisoner* so as to invoke the PLRA.

12      Plaintiff contends that an attorney should not be hindered in his ability to represent his

13  client by the PLRA's exhaustion requirement, but this ignores the statute's mandatory language.

14      Exhaustion is *mandatory* before a suit is filed, although an inmate "need not exhaust

15  remedies if they are not 'available.'" *Ross*, 136 S.Ct. at 1854-55, 1856 (citations omitted).

16  Otherwise, "the PLRA's text suggests *no limits* on an inmate's obligation to exhaust—irrespective

17  of any 'special circumstances.'" *Id.* at 1856 (emphasis added). "[T]hat mandatory language means

18  a court *may not* excuse a failure to exhaust, even to take such circumstances into account." *Id.*

19  (citation omitted) (emphasis added). "*[M]andatory* exhaustion statutes like the PLRA establish

20  *mandatory* exhaustion regimes, *foreclosing judicial discretion*." *Id.* at 1857 (citation omitted)

21  (emphasis added). In sum, the mandatory nature of the exhaustion requirement is well established.

22  Even if the court bought into Plaintiff's argument (it does not), it does not have discretion to excuse

23  Plaintiff from the exhaustion requirement.

24      Plaintiff's argument that because he is untrained in the law and eventually secured counsel

25  made administrative remedies somehow "unavailable" to him is equally unavailing.

26      Foremost, Plaintiff does not demonstrate how NDOC's grievance procedure was *actually*

27  unavailable to him. While he may be untrained in the law, he does not assert that he was not capable

28  of articulating to prison officials, in layman's terms, how he was purportedly wronged. Even if he

advanced this theory, it is blatantly contradicted by his grievance history. (ECF Nos. 78-2, 78-4.)

Additionally, the Supreme Court and the Ninth Circuit have recognized administrative procedures as being unavailable in a limited number of circumstances. None of these would justify the extension of the "unavailability" concept that Plaintiff proposes here.

In *Ross,* the Supreme Court recognized three instances where administrative procedures were unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end-with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it"; (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S.Ct. at 1859-1860.

In *Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017) (per curiam), the Ninth Circuit characterized the list in *Ross* as "non-exhaustive." The Ninth Circuit has found administrative remedies unavailable in circumstances, some of which come within the contours of the unavailability outlined by the Supreme Court in Ross. *See e.g., Andres,* 867 F.3d at 1078-79 (citations omitted) (failure to timely respond to an inmate's properly filed grievance renders remedies unavailable); *Albino v. Baca,* 747 F.3d 1162, 1172-73 (9th Cir. 2014), *cert. denied*, 135 S.Ct. 403 (Oct. 20, 2014) (administrative remedies unavailable "[w]here a prison warden incorrectly implied that an inmate needed access to a nearly unobtainable prison policy in order to bring a timely administrative appeal"; *McBride v. Lopez,* 807 F.3d 982, 984 (9th Cir. 2015) ("[f]ear of retaliation may be sufficient to render the inmate grievance procedure unavailable"); *Sapp v. Kimbrell*, 623 F.3d 813 (9th Cir. 2010) (where prison officials declined to reach the merits of a particular grievance "for reasons inconsistent with or unsupported by applicable regulations"; *Marella v. Terhune*, 568 F.3d 1024, 1027-28 (9th Cir. 2009) (where an inmate "did not have access to the necessary grievance forms within the prison's time limits for filing a grievance"); *Brown v. Valoff,* 422 F.3d 926, 937 (9th Cir. 2005) (where "prison officials inform the prisoner that he cannot file a grievance").

Plaintiff's argument also ignores the purpose of the PLRA's exhaustion requirement. "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities *before being haled into court*." *Jones v. Bock,* 549 U.S. 199, 204 (2007). "This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." *Id.* (citation omitted). The purpose of exhaustion is the same whether an inmate litigant eventually proceeds to court pro se or represented. If an inmate were not required to exhaust any time he eventually secured a lawyer to represent him in court, prison officials would never be offered an opportunity to resolve the issues raised by these inmates before being brought into a lawsuit.

Finally, Plaintiff asserts that it is "arguable" that he was not required to exhaust claims related to the coverless recreation cage, or is excused from such exhaustion, because that claim was brought in Count I of the SAC by counsel. This argument also lacks legal support. This too, would provide an end-run around the PLRA, which makes exhaustion *prior to* filing the complaint mandatory. Claims raised in an amended complaint must be exhausted prior to the filing of the amended complaint. *See Cano v. Taylor*, 739 F.3d 1214, 1220 (9th Cir. 2014).

**4. Grievance 2006-29-93242**

Plaintiff acknowledges that the only grievance he filed relative to his skin and medical treatment related to his skin was grievance 2006-29-93242. (*See* ECF No. 84 at 4-5; grievance at ECF No. 78-4.)

**a. Informal Level**

Plaintiff filed an informal level grievance dated January 7, 2015, and it was assigned grievance number 2006-29-93242. (ECF No. 78-4 at 2-4.) The following is a summary of what he stated in the informal level grievance: Two years prior, he was concerned about moles changing shape and color. (*Id.* at 2.) He was seen by a white male, who briefly looked at Plaintiff and told him he was fine. (*Id*.) Not long after that visit, one of his moles turned black, and several months later a small bump appeared on his left ear that would sometimes bleed. (*Id*. at 2-3.) He sent medical kites, and most of the time never received a response, and when he did receive a response they said he was scheduled for nurse sick call. (*Id*. at 3.)

He was seen by Nurse Practitioner Fey on September 26, 2014, who did not look at his moles, but said he had "too many for her time." (*Id*.) She did schedule him for one removal. (*Id*.) He asked her about his left ear, and she told him it was a skin lesion and she would not look at it. (*Id*.) He was rescheduled two times, and in December he expressed concern to another nurse. (*Id*.) That nurse was so concerned she placed him on the urgent sick call list with possible skin cancer. (*Id*. at 3-4.)

On December 23, 2014, he was seen in medical by Dr. Holmes. (*Id*. at 4.) Dr. Holmes saw the black mole on his right side, and said he was concerned and scheduled it to be removed. (*Id*.) Plaintiff asked him about his left ear, and he said it looked like basal cell carcinoma (BCC). (*Id*.) He advised Dr. Holmes he had been kiting about it for a year, and asked if it could be looked into further, and Dr. Holmes told him: "no only one at a time." (*Id*.) He indicated the removal (of the mole that had turned black) was also rescheduled several times. (*Id*.) He went on to state: "The solution to this problem is to remove all suspect moles/lesions b[i]opsy the[m] to determin[e] if any are cancer[ous] and any tests/treatment covered by the NDOC as well as compensation to me for the stress caused over the last two years [due] to the lack of adequate medical care." (*Id*.)

The informal level grievance was assigned to T. Wickham, who denied the grievance, stating: "Since the date of this grievance, you have had two procedures in the Medical Building: 2/17/15 and 3/19/15. If your condition changes or worsens, please submit a medical request to be placed on Doctor Sick Call." (ECF No. 78-4 at 5.)

**b. First Level**

A first level grievance was filed and dated May 4, 2015. (ECF No. 78-4 at 6-8.) The following is a summary of Plaintiff's statement in the first level grievance: He started this process while in HDSP on ad-seg for court on June 3, 2011, by asking for sunscreen, and even though he clearly stated he was not authorized to purchase sunscreen because it was in a squeeze bottle, he was told to "buy sunblock on store." (*Id*. at 6-7.) He said that sunscreen is preventative and medical at HDSP would not "provide the option to protect myself from the sun!" (*Id*. at 7.) He stated the following:

> A statement made by the Skin Cancer Foundation: 'While <u>BCC's</u> and other skin cancers are almost always curable when detected early, it is best to prevent them in

the first place by seeking shade especially between the hours of 10am and 4pm (<u>No</u> shade in the cages at H.D.S.P.), Do not burn (inmates are left in the sun for a minimum of one hour) and to use a broad spectrum UVA/UVB sunscreen with SPF of 30 or higher.

(*Id*.)

He reiterated that medical denied him the ability to protect himself, and then he had cancer, and he needed more cancer removed from his left ear because not all of it was removed the first time. (*Id*. at 7-8.) He claimed it took almost four years for medical to do two procedures, and even then he had not been fully checked for other cancer. (*Id*. at 8.) He indicated that HDSP medical did not even tell him they had not cut out all of the cancer, and he only found out after he arrived at LCC. (*Id*.)

Plaintiff received a response to the first level grievance stating:
You have a current order for Sun-screen and signed receiving it on 7/5/15 and 8/14/15. Today, you were seen by an NDOC Senior Physician to address your concerns about skin cancer. After discussion with the doctor, you mutually decided the best option was to be sent to NNCC where you can be more closely monitored. Arrangements for your transfer have been initiated. You will be notified when they have been finalized.

(ECF No. 78-4 at 9.)

### c. Second Level

Plaintiff filed a second level grievance dated July 21, 2015. (ECF No. 78-4 at 10-22.) Plaintiff reiterated that he had cancer, and that it took "3 1/2 years, many kites, being told over and over that I was fine until I filed a grievance at which point biopsies were finally done proving I was <u>not</u> fine." (*Id*. at 10-11.) He referenced a statement by Dr. Aranas that a spot on his arm was only a "sun spot" that he should not worry about it, but now he has four spots. (*Id.* at 11.)

He then discussed that Dr. Hipkin, at LCC, was trying to help, and prescribed Imiquiod and said it would inflame the cancer so it could be easily seen and then removed. (*Id.*) He reported that on June 29, 2015, he saw Dr. Donnelly for sunblock and his left arm and ear were examined, and Dr. Donnelly told him he was fine; yet, the biopsy report said not all the cancer was removed from the left ear. (*Id*. at 11-12.) He reiterated that he had inflamed cancer, that had not been removed, and if left untreated could become locally advanced BCC which is dangerous and perhaps life-threatening. (*Id*. at 12.) He noted seven spots that had become open sores that bleed

1    and ooze and crust repeatedly. (*Id*.) He asserted that he never should have had to endure the

2    sunburns that caused this. (*Id*. at 13.)

3        He again stated that the remedy was for "NDOC to cover the cost of any treatment, perform

4    all tests, the removal of all BCC and any suspect moles[,] as well as compensate[e] [him] for all

5    [he] ha[s] had to endure and will endure." (*Id.* at 14.)

6        He attached a copy of a complaint he had filed with the Integrity Unit of the Attorney

7    General's Office. (Reference at ECF No. 78-4 at 14, letter at ECF No. 78-4 at 15-22.) The

8    complaint letter is dated July 7, 2015. (*Id.* at 15.) The following is a summary of the letter:

9        Plaintiff stated that he had BCC caused by repeated sunburns. (*Id.* at 15.) He mentioned

10    that he was in ad-seg at HDSP, where the only opportunity to go outside was in a cage with no

11    shade for one hour. (*Id*.) Ad-seg inmates were not allowed to purchase anything in a squeeze bottle,

12    and when he sent a medical kite, he was told to buy it at the store (even though he was precluded

13    from doing so). (*Id.)*

14        On June 14, 2011, he sent a medical kite asking for a skin examination because he had

15    some moles and freckles that started to change. (*Id*. at 16.) He got no response. (*Id*.) On August

16    17, 2011, he sent another kite with the same request. (*Id*.) A nurse came by his cell door and looked

17    at him for about twenty seconds and left. (*Id*.)  On September 15, 2011, he got Dr. Hanf to come

18    see him, and Dr. Hanf told him that he was fine. (*Id*.) Plaintiff still thought something was not

19    right. (*Id*.)

20        In 2014, after he had gone back and forth to ESP and HDSP, he was at HDSP and one of

21    his moles had turned completely black and others were still changing. (*Id*.) He started kiting

22    medical again, but never received a response. (*Id*)  On August 8, 2014, he was put on nursing sick

23    call, and Nurse Fey took measurements of some of the moles, but said he had too many to look at

24    them all; though, she did schedule one on the right side for biopsy. (*Id*.) When he asked her about

25    his left ear and left arm she said, "only one at a time." (*Id*.)

26        On December 23, 2014, he was seen by Dr. Holmes regarding the black mole on his right

27    side. (*Id*.) He tried to have his left ear and left arm examined. (*Id*. at 17.) Dr. Holmes said the ear

28    looked like BCC. (*Id*.) Plaintiff asked if he could do something about it, and Dr. Holmes said: "no

1    only one at a time." (*Id.*) His left ear became so bad that the nurses put him on urgent sick call

2    twice, on December 26, 2014 and December 29, 2014, again on January 21, 2015, and he was

3    rescheduled. (*Id.*)

4    On February 4, 2015, he saw Dr. Aranas, who scheduled biopsies of the right side and left

5    ear. (*Id.*) Plaintiff asked about the red spot on his left arm, and his response was, "it's only a sun

6    spot, don't worry about it." (*Id.*)

7    Biopsies of the left ear and right side were taken on February 12, 2015. (*Id.*) On March 12,

8    2015, he was advised he had BCC, and was scheduled for two more biopsies, one on each foot.

9    (*Id.* at 18.) The biopsies took place on March 19, 2015. (*Id.*)

10   He saw Dr. Hipkin on April 29, 2015, who told Plaintiff that not all of the cancer had been

11   removed from his left ear. (*Id.*) Dr. Hipkin prescribed him Imiquimod and said it would inflame

12   the cancer so it could be detected and removed. (*Id.*) He was also told by HDSP medical that some

13   of the cancer was missed. (*Id.* at 18-19.)

14   On June 29, 2015, he was given a prescription for sunblock at his request. (*Id.* at 19.) While

15   at medical, he pointed out the open sores on his left arm and left ear to Dr. Donnelly. (*Id.*)

16   Dr. Donnelly told Plaintiff he was fine, and that he would not remove the rest of the cancer in the

17   left ear or biopsy his left arm. (*Id.*) The biopsy report on the left ear said the rest of the cancer

18   needed to be removed. (*Id.*)

19   In the administrative claim form that accompanied the grievance, signed by Plaintiff under

20   penalty of perjury and dated July 21, 2015, he was asked to describe how his claim occurred and,

21   he stated that there was an "[a]ccumulation of errors on behalf of HDSP medical starting with no

22   providing me the ability to protect myself from sunburn that caused cancer by prescribing me

23   sunblock then telling me im fine until I filed a grievance at which point biopsies proved I have

24   cancer. Now im being told again that im fine even though I now have 7 spots of active cancer

25   growing." (*Id.* at 24, 25.)

26   There is another second level grievance for grievance 2006-29-93242, with a date of

27   October 13, 2015. (ECF No. 78-4 at 26-27.) This second level grievances states nothing can negate

28   the fact that he has cancer, and after years of kites asking for help he had to file a grievance to get

1    biopsies done that prove he has cancer. (*Id*. at 26.) He stated that sunblock is preventative and

2    should have been given to him four years prior. (*Id*. at 27.) As a remedy, he asked for all treatment

3    at NDOC's expense, and compensation for mental anguish, pain and suffering. (*Id*.)

4        Defendants did not submit the grievance documentation containing the response to either

5    of the second level grievances with the rest of the documentation for grievance 2006-29-93242.

6    The court reviewed the inmate grievance history report filed by Defendants (ECF No. 78-2), which

7    does appear to contain the second level response. (ECF No. 78-2 at 4-5.) It is not clear why there

8    are two second level grievances, but the report has an entry that indicates the second level

9    grievance was assigned to Romeo Aranas, and was denied on the merits, stating: "NNCC rcvd

10   3/1/16. Mr. Holden, You are now housed at NNCC. You had surgery on 12/29/15 to remove the

11   basal cell carcinoma from the left ear. Follow up is scheduled." (*Id*. at 5.)

12       **5. Count I**

13       In Count I, Plaintiff alleges that defendants Neven, Cox, McDaniel, Filson, Baca, Stroud,

14   Nash, Morrow, Howell, Wickham, Henson, Sandoval, Cegavske, and Laxalt were deliberately

15   indifferent to Plaintiff's health and safety by promulgating a policy, practice or custom of placing

16   him in recreation cages without sufficient covering to shield him from the harmful rays of the sun

17   when they were aware temperatures regularly exceeded 100 degrees in the spring and summer

18   months. (ECF No. 58 at 13-14.)

19       Defendants argue that Plaintiff never submitted a proper or timely grievance to NDOC

20   regarding being placed in an uncovered recreation cage for yard time. Defendants assert that

21   Plaintiff did not raise the issue of uncovered recreation cages until he submitted his first level

22   grievance on May 4, 2015, two years after he left HDSP for the second time. In addition, they note

23   that he improperly raised the issue for the first time in a first level grievance.

24       Plaintiff asserts that he filed grievance 2006-29-93242, which "clearly alluded to the issue

25   of uncovered recreation cages and the prohibition against purchase of sunscreen in ad-seg units."

26   (ECF No. 84 at 8, citing ECF No. 78-4 at 7.) He argues that there is no evidence that prison officials

27   rejected the grievance as improper or untimely.

28       The court will address the preliminary question of whether grievance 2006-29-93242

1    contained facts sufficient to serve to exhaust his claim in Count I.

2        In *Jones v. Bock,* the Supreme Court confronted the issue of "how courts determine whether

3    a prisoner has properly exhausted administrative remedies," and "specifically, the level of detail

4    required in a grievance to put the prison and individual officials on notice of the claim." *Jones*,

5    549 U.S. at 205. "[T]o properly exhaust administrative remedies prisoners must 'complete the

6    administrative review process in accordance with the applicable procedural rules.'" *Id*. at 218

7    (quoting *Woodford*, 548 U.S. at 88).  These rules "are defined not by the PLRA, but by the prison

8    grievance process itself." *Id*. "Compliance with the prison grievance procedures, therefore, is all

9    that is required by the PLRA to 'properly exhaust.'" *Id*.

10       "The level of detail necessary in a grievance to comply with the grievance procedures will

11   vary from system to system and claim to claim, but *it is the prison's requirements,* and not the

12   PLRA, that *define the boundaries of proper exhaustion*." *Id*. (emphasis added).

13       In *Jones*, the complaints were dismissed for failure to exhaust administrative remedies

14   because the initial grievances did not identify each of the defendants they later sued. *Id*. at 217.

15   The Supreme Court pointed out, however, that nothing in the prison's policy specified who must

16   be named in a grievance. *Id*. at 218. Instead the policy required prisoners to "be as specific as

17   possible" in their grievances, and at the same time advised them to be "brief and concise." *Id*.

18   Therefore, this was not required for proper exhaustion. *Id*.

19       Thus, AR 740 defines the contours of proper exhaustion. NDOC's procedure, set forth in

20   AR 740, requires inmates to submit *at the informal level*, "[a]ll documentation and factual

21   allegations available to the inmate[.]" (AR 740.05.5.A, ECF No. 85-1 at 6, ECF No. 85-2 at 7,

22   ECF No. 85-3 at 7.)

23       The Ninth Circuit subsequently addressed what "standard of factual specificity [is] required

24   when a prison's grievance procedures do not specify the requisite level of detail." *Griffin v. Arpaio*,

25   557 F.3d 1117, 1120 (9th Cir. 2009). In *Griffin*, the jail's procedures gave "little guidance as to

26   what facts a grievance must include" and merely advised the grievance to "[b]riefly describe [the]

27   complaint and a proposed resolution." *Griffin*, 557 F.3d at 1120.  The Ninth Circuit adopted the

28   standard articulated by the Seventh Circuit in *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002),

which held that "when a prison's grievance procedures are silent or incomplete as to factual specificity, 'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.'" *Id*. (quoting *Strong*, 297 F.3d at 650).

"A grievance need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved." *Id*. "A grievance also need not contain every fact necessary to prove each element of an eventual legal claim." *Id*. "The primary purpose of a grievance is to *alert the prison to a problem and facilitate its resolution*, not to lay groundwork for litigation." *Id*. (citing *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004)) (emphasis added). The grievance must "'provide enough information … to allow prison officials to take appropriate responsive measures.'" *Id*. at 1121 (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)).

After adopting the *Strong* standard, the Ninth Circuit concluded Griffin's grievance did not provide notice of the alleged disregard of his lower bunk assignments to put prison officials on notice of a claim of deliberate indifference to medical needs he eventually raised in his lawsuit. He "did not alert the prison to the nature of the problem." *Id*. at 1121. Therefore, he failed to exhaust administrative remedies.

The court will now examine what level of detail was required by Plaintiff under AR 740 in order to properly alert prison officials of an issue in the *informal level* of a grievance such that the prisoner could proceed to properly exhaust administrative remedies.

While AR 740 requires an inmate to include all documentation and factual allegations available *at the informal level*, it says nothing further about the level of detail of the factual allegations. Judges within this district, including District Judge Du, have previously found AR 740 to lack guidance regarding the specificity required; therefore, the grievances are governed by the *Strong* standard. *See, e.g., Meeks v. Burson*, 3:12-cv-00322-MMD-WGC, 2014 WL 4666743, at *7 (D. Nev. Sept. 17, 2014); *Mayo v. Williams,* 2:16-cv-00047-APG-VCF, 2016 WL 5867419, at *3 (D. Nev. Oct. 6, 2016).  In other words, Plaintiff's grievance is factually sufficient to serve to exhaust a claim if "it alerts the prison to the nature of the wrong for which redress is sought." *Griffin*, 557 F.3d at 1120 (citation omitted).

1    Since the prison's own regulations define the contours of proper exhaustion, *Jones,* 549

2    U.S. at 218, it is critical here that AR 740.05.5.A requires that the grievance contain the factual

3    allegations necessary to alert the prison to the nature of the wrong for which redress is sought at

4    the *informal level*. Therefore, the court must examine the informal level grievance to determine

5    whether it alerted the prison to the problem to facilitate its resolution.

6    Plaintiff's informal level grievance makes no mention of the placement of ad-seg prisoners

7    in recreation cages without sufficient covering to shield them from the sun's harmful rays,

8    particularly during spring and summer months. Instead, the informal level grievance focuses on

9    the fact that he submitted numerous complaints that he was concerned about moles changing in

10   shape and color as well as lesions on his skin and possible skin cancer, and at first received no

11   response, and then a delay in responding, as well as inadequate examinations and treatment. He

12   specifically identified his proposed remedy as removal of all suspect moles and lesions for biopsy,

13   and appropriate treatment, as well as compensation for what he endured. He did not mention the

14   recreation cages and did not request any relief in this regard.

15   Plaintiff points to his first level grievance as well as an attachment to the second level

16   grievance as raising this issue. (ECF No. 84 at 8, citing ECF No. 78-4 at 7 (first level grievance

17   contains a brief parenthetical stating there was no shade in the cages at HDSP), 15 (attachment to

18   second level grievance contains a brief reference that he was in ad-seg at HDSP and the only

19   opportunity to go outside was in a cage with no shade for one-hour).) The first level grievance

20   contains a very brief parenthetical referencing the recreation cages, and the attachment to the

21   second level grievance references this as well. These brief references cannot be said to have alerted

22   the prison to the nature of the wrong for which redress was sought, since his conversations about

23   redress never included a discussion of the recreation cages or a policy-change in this regard. Even

24   more importantly, AR 740 required the allegations to be raised at the *informal level* and they were

25   not.

26   The informal level grievance did not put the prison on notice of the problem he now sues

27   about in Count I-the policy of placing inmates in ad-seg at HDSP in recreation cages without

28   adequate protection from the sun, so that prison officials could facilitate a resolution of that issue.

1    Therefore, the informal grievance does not serve to exhaust the claim raised in Count I.

2    In conclusion, the court finds that Defendants' motion for summary judgment should be granted

3    with respect to Count I.

4          **6. Counts II & III**

5          In Count II, Plaintiff alleges that Neven, Cox, McDaniel, Filson, Baca, Stroud, Nash,

6    Morrow, Howell, Wickham, Henson, Sandoval, Cegavske, and Laxalt were deliberately

7    indifferent when they promulgated a policy, practice or custom of prohibiting sunscreen to be sold

8    to prisoners in HDSP ad-seg units because the store sold it in squeeze bottles, and squeeze bottles

9    were prohibited in ad-seg units; that they were aware temperatures at HDSP in the spring and

10   summer regularly exceeded 100 degrees; and, they made no means for ad-seg inmates to obtain

11   sunscreen in any other form.

12         Defendants argue that Plaintiff never submitted a timely or proper grievance regarding this

13   policy. Defendants assert that Plaintiff should have submitted this grievance after the canteen

14   denied his request to purchase sunscreen, but he waited until May 4, 2015, when he filed a first

15   level grievance. They assert the grievance was improper because it was untimely and raised the

16   issue for the first time in a first level grievance.

17         In Count III, Plaintiff avers that these same defendants were deliberately indifferent when

18   they failed to ensure HDSP's medical department provided sunscreen to requesting prisoners in

19   HDSP's ad-seg units when they could not purchase sunscreen from the HDSP store due to the

20   policy against squeeze-bottle products in ad-seg.

21         Again, Defendants argue Plaintiff never submitted a timely or proper grievance on this

22   issue. He did not address the inability to obtain sunscreen until he filed a first level grievance on

23   May 4, 2016.

24         Plaintiff points to his first level grievance and an attachment to the second level grievance

25   as properly putting prison officials on notice as to the issues raised in Counts II and III. (ECF No.

26   84 at 9, citing ECF No. 78-4 at 6-9, 15.)

27         The preliminary issue, again, is whether Plaintiff's grievance was factually sufficient to

28   properly exhaust his administrative remedies with respect to Counts II and III.

AR 740 requires that the allegations supporting a problem being asserted in a grievance be set forth at the *informal level*. Plaintiff's informal level grievance makes no mention of the denial of sunscreen as a result of the prohibition on squeeze bottles in the ad-seg units at HDSP or the failure to otherwise make sunscreen available to these inmates. Therefore, he did not properly put the prison officials on notice of the problem with the sunscreen at the *informal level* as is required by AR 740. As a result, it is recommended that Defendants' motion be granted with respect to Counts II and III.

The court's findings with respect to Counts I-III should not be interpreted as condoning such policies, if they in fact exist; but, only a conclusion that Plaintiff did not properly exhaust his administrative remedies as to those claims. The court assumes that in light of the filing of this lawsuit, NDOC examined its policies concerning sun exposure and the ability to acquire sunscreen with respect to ad-seg inmates housed at HDSP.

### 7. Count IV-Dr. Hanf

#### a. Allegations as to Dr. Hanf

In Count IV, Plaintiff alleges that defendant Dr. Hanf was deliberately indifferent when he failed to prescribe Plaintiff sunscreen and by failing to thoroughly assess and order a biopsy of Plaintiff's skin lesions/moles when the need for this was blatantly obvious.

The general allegations of the SAC allege that Plaintiff was in ad-seg at HDSP first from March 9, 2011 thru May 9, 2012, and his outdoor recreation involved placement in an uncovered, fenced-in steel cage for one to three hours during the spring and summer months without any covering to shield him from the sun. (ECF No. 58 ¶¶ 51, 58.) He could not get sunscreen from the prison store because it came in squeeze bottles, and when he asked medical, he was told he had to purchase it from the store, even though they had already denied his request. (*Id.* ¶¶ 54, 56.) He sent a kite to HDSP medical asking to be seen for freckles and moles that appeared to be changing. (*Id.* ¶ 64.) He saw a nurse at the window of his cell for twenty seconds, who left without examining him or discussing his skin concerns. (*Id.* ¶¶ 65-66.) He sent another kite on August 17, 2011, asking to see a doctor regarding his skin concerns. (*Id.* ¶ 67.) Then, on September 15, 2011, Dr. Hanf examined Plaintiff in his unit and told him he was fine and that the lesions on his skin appeared

benign. (*Id.* ¶ 68.) He did not order a biopsy or otherwise test the skin, and did not prescribe any sunscreen. (*Id.* ¶ 69.)

### b. Argument

First, Defendants argue that Plaintiff never submitted a timely or proper grievance complaining about Dr. Hanf's failure to prescribe sunscreen.

Plaintiff argues that the informal grievance clearly states that when he was seen by a thinly built white male doctor with salt and pepper hair, this doctor merely looked at him briefly and said he was fine, and the attachment to the second level grievance also states that Dr. Hanf examined him and did nothing except tell him he was fine.

Second, Defendants argue that while Plaintiff did submit a grievance regarding the removal of suspect moles, he did not do so until January 7, 2015, even though Dr. Hanf had examined Plaintiff on September 15, 2011.

### c. Did the grievance put prison officials on notice of the nature of the wrong for which redress is sought in Count IV?

First, the court will address the preliminary issue of whether Plaintiff properly put prison officials on notice of the nature of the wrong for which redress is sought in Count IV. Again, pursuant to AR 740.05.5, the factual allegations alerting prison officials to the nature of the wrong must have been contained within the *informal level* grievance.

In the informal level grievance Plaintiff stated that he had become concerned about some moles changing shape and color and sent kites to medical. He was seen by a thin-build white male with salt and pepper hair, who looked at him briefly and said he was fine. Not long after that visit in the unit, one of the moles turned black and he sent out kites which went unanswered, and he wasn't seen again until September 26, 2014, by Nurse Practitioner Fey. Plaintiff went on to discuss that another doctor said a lesion on his ear looked like BCC, as well as his continuing struggle to obtain adequate care for his skin condition. He requested removal of suspect moles and lesions for biopsy to determine if they were cancerous, and treatment and compensation.

These allegations contained within the informal level grievance are substantially similar to the general allegations set forth in the SAC.

Neither the PLRA nor AR 740 requires a prisoner to identify the defendants later sued. Nor is a prisoner required to set forth legal terminology. While the informal level grievance did not specifically mention the failure to prescribe sunscreen, the grievance "need not contain every fact necessary to prove each element of an eventual legal claim." *Griffin,* 557 F.3d at 1120. The court concludes that the informal grievance sufficiently alerted prison officials that Plaintiff was complaining about an inadequate response to his concerns about his skin, which is the gravamen of his Eighth Amendment claim against Dr. Hanf in Count IV. He specifically noted that he saw a thin-build white male with salt and pepper hair, who looked at him briefly and said he was fine. He later discovered he was not fine, putting prison officials on notice that he was challenging perceived inadequate care from this person who he saw (later identified as Dr. Hanf).

The court is aware this is in contrast to the court's finding with respect to Counts II and III. Those claims are based specifically on purported policies precluding ad-seg inmates at HDSP from accessing sunscreen either from the prison store or the medical department. The assertions made in the informal level grievance give no hint that Plaintiff was challenging those policies. He specifically references his visit with Dr. Hanf (who he could not, and was not required to, identify at the time), and the informal level grievance put prison officials on sufficient notice that he was challenging the care (or lack thereof) from Dr. Hanf. Again, he is not required to list every fact that ultimately gives rise to a claim asserted in litigation, which in this instance includes the lack of further testing and failure to prescribe sunscreen. Prison officials had enough information from what Plaintiff asserted in the informal level grievance to try to resolve any issue concerning care from this person, as opposed to the purported sunscreen policy, which Plaintiff did not alert them to in the informal level grievance.

### d. Timeliness of the Grievance

The court will now address Defendants' argument that the grievance was not timely. In his general arguments, Plaintiff asserts that prison officials never informed Plaintiff his grievances were untimely in responding to the grievance on the merits at each level of review. (ECF No. 84 at 5.)

Plaintiff clearly alleges that Dr. Hanf examined him, and said he was fine, without

1    prescribing sunscreen or ordering a biopsy or other test of his skin, on or around September 15,

2    2011. (ECF No. 58 ¶¶ 68-69.) It is not until he saw Dr. Holmes in December of 2014, however,

3    that he was advised he may have a form of skin cancer. (ECF No. 58 ¶¶ 79-82.) Dr. Holmes

4    scheduled an apparent biopsy of this mole, but it was repeatedly postponed. Plaintiff filed his

5    grievance on January 7, 2015.

6         It is reasonable to assume Plaintiff did not know that the changes he was observing in his

7    skin were likely a form of skin cancer until Dr. Holmes confirmed this in December 2014, at which

8    time his claim against Dr. Hanf accrued. *See e.g. Lukovsky v. City of San Francisco,* 535 F.3d

9    1044, 1048 (9th Cir. 2008) (citations omitted) ("Under federal law, a claim accrues when the

10   plaintiff knows or has reason to know of the injury which is the basis of the action."). After all,

11   Dr. Hanf allegedly told him he was fine. He indicated in his grievance documentation that he

12   trusted Dr. Hanf, but still thought something was not right, so he continued to kite regarding his

13   concern until he was eventually seen by Dr. Holmes. He initiated his grievance within six months

14   of being told he could possibly have skin cancer by Dr. Holmes. Therefore, the court finds the

15   grievance was in fact timely.

16        In any event, there is no evidence in the record that Defendants ever rejected the grievance

17   on grounds that it was untimely. While Defendants argue that they should not be penalized for

18   addressing grievances on the merits, there is case authority supporting the court's finding.

19        In *Reyes v. Smith*, 810 F.3d 654 (9th Cir. 2016), the defendant moved to dismiss, arguing

20   the inmate failed to exhaust because he did not follow the prison's rule requiring the inmate to list

21   all staff members involved in the grievance and to describe their involvement. *Reyes*, 810 F.3d at

22   657-58. The Ninth Circuit reiterated that prisoners are required to adhere to procedural rules of the

23   grievance process, *id.* at 657, but held (in conformity with the seven other circuits to address the

24   issue): "a prisoner exhausts 'such administrative remedies as are available,' …, under the PLRA

25   despite failing to comply with a procedural rule if prison officials ignore the procedural problem

26   and render a decision on the merits of the grievance *at each available step* of the administrative

27   process." *Id*. at 658 (internal citation omitted) (emphasis added).

28        According to the grievance documentation submitted by Defendants, prison officials did

- 23 -

not reject his grievance as untimely and rendered a decision on the merits at the informal, first and second levels. Therefore, Plaintiff properly exhausted his administrative remedies with respect to his claim in Count IV against Dr. Hanf.

### 8. Count V- Dr. Holmes

Defendants argue that Plaintiff failed to properly exhaust his administrative remedies as to defendant Dr. Holmes. (ECF No. 78 at 13-14.) In response, Plaintiff asserts that the argument must be stricken because counsel for Defendants does not represent Dr. Holmes. (ECF No. 84 at 11.) Defendants provide no response to this argument.

It is true that defense counsel has not entered a notice of appearance for Dr. Holmes. In fact, Dr. Holmes has not yet been served with the SAC, and the court has recommended dismissal of Dr. Holmes pursuant to Federal Rule of Civil Procedure 4(m), unless Plaintiff can make a showing of good cause as to why the service deadline should be extended. As a result, Defendants' motion for summary judgment should be denied, without prejudice, as to Dr. Holmes.

### 9. Count VI- Dr. Aranas

In the general allegations of the SAC, Plaintiff alleges that after he saw Dr. Holmes in December of 2014, and his biopsy was repeatedly postponed, he submitted his grievance regarding the lack of treatment he was receiving for his skin condition, which is the subject of this motion. (ECF No. 58 ¶¶ 79-86.) Then, on January 28, 2015, after he submitted his first level grievance, he sent a kite to HDSP's medical department stating that the moles on his skin were changing color and getting darker. (*Id*. ¶ 87.) On February 4, 2015, he saw Dr. Aranas and was examined for his skin ailment. (*Id*. ¶ 88.) Plaintiff alleges that Dr. Aranas told him that he would schedule biopsies for the skin lesions/moles on the right side and left ear. (*Id*. ¶ 89.) Plaintiff told Dr. Aranas about a red spot on his left arm, and Dr. Aranas purportedly told him not to worry about it, and that it was just a sun spot. (*Id*. ¶ 90.) Plaintiff advised Dr. Aranas the spot changed in size and would occasionally bleed, but Dr. Aranas insisted it was just a sun spot, and ignored Plaintiff's complaint. (*Id*. ¶ 91.) The biopsies of the right side and left ear were finally performed on February 12, 2015, and later that day he had surgery on his ear. (*Id*. ¶¶ 92-93.) A month later, on March 12, 2015, he was informed by HDSP medical staff that the skin lesion on the left ear was in fact BCC. (*Id*. ¶¶

94-95.)

In Count VI, Plaintiff alleges that defendant Dr. Aranas was deliberately indifferent to his serious medical needs when he disregarded various lesions/moles on Plaintiff's skin as mere sun spots without having first obtained a biopsy since Plaintiff was a prime candidate for skin cancer and had been regularly complaining of negative changes to his skin.

Defendants argue that Plaintiff never submitted a grievance to NDOC regarding the way in which Dr. Aranas supposedly disregarded his moles/lesions when he examined Plaintiff on February 4, 2015. While Defendants acknowledge that Plaintiff mentioned Dr. Aranas in the second level grievance, they claim he did not properly exhaust by raising the issue in the second level grievance.

Plaintiff argues that the attachment to Plaintiff's grievance clearly references his complaints about Dr. Aranas' care. (Citing ECF No. 78-4 at 17.)

Again, AR 740.05.5.A is dispositive of this issue. Plaintiff was required to assert at the *informal level* the factual allegations sufficient to put prison officials on notice of the claim eventually asserted against Dr. Aranas—the disregard of various lesions/moles on Plaintiff's skin as mere sun spots, which occurred when Dr. Aranas examined him on February 4, 2015. Plaintiff could not have done so because this alleged conduct on the part of Dr. Aranas did not occur until after he had already filed his informal grievance. The prison's regulations govern how an inmate must properly exhaust administrative remedies. To properly exhaust his claim that a doctor inappropriately disregarded his moles/lesions as sunspots, Plaintiff was required to assert facts to that effect in the informal level grievance. He did not.

Defendants' motion for summary judgment should be granted as to the claim asserted against Dr. Aranas in Count VI.

**10. Count VII-Dr. Hipkin**

In Count VII, Plaintiff argues that defendant Dr. Hipkin was deliberately indifferent when he prescribed Plaintiff medication in preparation for further surgical removal of cancer from his left ear, and then failed to follow up and pursue additional surgical treatment for the skin cancer on Plaintiff's left ear.

The allegations concerning Dr. Hipkin's conduct in the SAC did not occur until months after Plaintiff had filed his informal level grievance. Allegations putting prison officials on notice of Dr. Hipkin's conduct in the spring and summer of 2015 are not contained within his informal level grievance; therefore, he did not properly exhaust his administrative remedies with respect to the claim against Dr. Hipkin in Count VII.

Thus, even though Dr. Hipkin was apparently never served with the SAC, the motion should be granted as to Count VII.

**11. Count VIII- Dr. Donnelly**

In the general allegations of the SAC, Plaintiff alleges that he saw Dr. Donnelly on June 29, 2015, and Dr. Donnelly prescribed him sunscreen but otherwise ignored his concerns regarding the need for further treatment of his left ear and skin lesions/moles. (ECF No. 58 ¶102.) Plaintiff claims Dr. Donnelly told him that he was fine; that there was no need to remove the BCC; and, nothing would be done regarding his left ear or left arm, even though Dr. Hipkin and his medical records indicated the left ear was still not clear of BCC. (*Id*. ¶¶ 103-104.)

In Count VIII, Plaintiff alleges that Dr. Donnelly was deliberately indifferent when he refused to pursue additional surgical treatment for the skin cancer on Plaintiff's left ear and left arm despite the fact that Plaintiff's medical records indicated all the cancer had not been removed from his left ear.

Defendants argue that Plaintiff never submitted a grievance to NDOC regarding Dr. Donnelly's alleged conduct. While Plaintiff mentioned Dr. Donnelly in the second level grievance, they contend this was improper.

Plaintiff points to the second level grievance as sufficiently putting prison officials on notice of the issues with Dr. Donnelly, and as such, maintains he exhausted his administrative remedies.

The informal level grievance makes no mention of the facts that would have put prison officials on notice of his complaints concerning Dr. Donnelly's care. It could not have because he did not see Dr. Donnelly until June of 2015, and his informal level grievance was filed in January of 2015. Therefore, he did not properly exhaust his administrative remedies pursuant to AR 740

1  with respect to this claim.

2  Defendants' motion for summary judgment should be granted as to the claim asserted

3  against Dr. Donnelly in Count VIII.

4  **B. Laxalt and Cegavske**

5  The court has recommended dismissal of all claims asserted against Laxalt and Cegavske

6  due to Plaintiff's failure to exhaust his administrative remedies. In addition, Plaintiff never served

7  Cegavske with the SAC. Therefore, the court need not address Defendants' argument that Laxalt

8  and Cegavske are entitled to summary judgment due to lack of personal participation. The court

9  does note for defense counsel's future reference that under Rule 25(d), "[a]n action does not abate

10  when a public official … otherwise ceases to hold office while the action is pending." In that case,

11  "[t]he officer's successor is automatically substituted as a party."

12  **C. Motion for Summary Judgment on the Merits as to Counts IV-VIII**

13  **1. Summary Judgment Standard**

14  "The purpose of summary judgment is to avoid unnecessary trials when there is no dispute

15  as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468,

16  1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all

17  reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810

18  (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall

19  grant summary judgment if the movant shows that there is no genuine dispute as to any material

20  fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other

21  hand, where reasonable minds could differ on the material facts at issue, summary judgment is not

22  appropriate. *See Anderson*, 477 U.S. at 250.

23  A party asserting that a fact cannot be or is genuinely disputed must support the
    assertion by:

24  (A) citing to particular parts of materials in the record, including depositions,
    documents, electronically stored information, affidavits or declarations,

25  stipulations (including those made for purposes of the motion only), admissions,
    interrogatory answers, or other materials; or

26  (B) showing that the materials cited do not establish the absence or presence of a
    genuine dispute, or that an adverse party cannot produce admissible evidence to

27  support the fact.

28  Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### 2. Counts V, VI, VII and VIII

The court need not address the arguments made with respect to the merits of the claim against Dr. Holmes in Count V because he has not been served with the SAC. In addition, the court need not address the arguments made as to the merits of the claims in Count VI (Dr. Hipkin), Count VII (Dr. Aranas), or Count VIII (Dr. Donnelly), since the court has concluded that Plaintiff did not properly exhaust his administrative remedies with respect to these claims.

Therefore, the only remaining claims are those asserted in Count IV against Dr. Hanf.

### 3. Count IV-Dr. Hanf

#### a. Deliberate Indifference to Serious Medical Needs

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the

1    examination of two elements: "the seriousness of the prisoner's medical need and the nature of

2    the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992),

3    *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also*

4    *Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091,

5    1096 (9th Cir. 2006)).

6         Defendants argument assumes Plaintiff's skin condition constitutes a serious medical need.

7    Therefore, the court's analysis will focus on whether Dr. Hanf was deliberately indifferent to his

8    serious medical need.

9         "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060

10   (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even

11   gross negligence. *Id.* Inadvertence, by itself, is insufficient to establish a cause of action under

12   section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a

13   prison official "knows of and disregards an excessive risk to inmate health or safety; the official

14   must both be aware of the facts from which the inference could be drawn that a substantial risk of

15   serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837

16   (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

17        Article I, section 6 of the Nevada Constitution contains the State corollary to the prohibition

18   on cruel and unusual punishment contained in the Eighth Amendment of the United States

19   Constitution; thus, Cruel and unusual punishment claims under the State constitution generally

20   follow the same standards as the federal constitution. *See e.g. Allred v. State,* 92 P.3d 1246, 1253-

21   54*, 120 Nev. 410, 420-21 (Nev. 2004); *Naovarath v. State*, 779 P.2d 944, 947, 105 Nev. 525, 529-

22   30 (Nev. 1989).

23                    **b. Facts**

24        In Count IV, Plaintiff alleges Dr. Hanf was deliberately indifferent in failing to prescribe

25   him sunscreen and failing to order a biopsy of his skin lesions, and that this contributed to his

26   development of skin cancer, pain, worsening of skin cancer, and a delay in his receipt of sunscreen

27   and eventual treatment. (*Id.* ¶¶ 136, 137.)

28        The facts, as they pertain to Dr. Hanf, are largely undisputed. The parties disagree,

1    however, regarding whether Dr. Hanf's conduct amounts to deliberate indifference.

2         Plaintiff is of Caucasian descent, with blonde hair, blue eyes, freckles and fair skin.

3    (ECF No. 58 ¶ 49; ECF No. 78 at 2.) He was transferred from ESP to HDSP, where he was placed

4    in the ad-seg unit, and was there initially from March 9, 2011 through May 9, 2012. (ECF No. 58

5    ¶¶ 47-48; ECF No. 78 at 2.) While in ad-seg at HDSP, he was placed in an uncovered steel

6    recreation cage for one to three hours. (ECF No. 58 ¶¶51-52; ECF No. 84 at 28 ¶ 3; ECF No. 78

7    at 2.) He tried to purchase sunscreen through the prison store, but the canteen rejected his order

8    because prisoners in segregation units are not permitted to have products in squeeze bottles, and

9    the sunscreen in the canteen was in squeeze bottles. (ECF No. 58 ¶¶ 54, 56; ECF No. 84 at 28 ¶ 4;

10   ECF No. 78 at 2.) He submitted a kite to HDSP's medical department asking for sunscreen, but

11   the medical department sent him back to the canteen, and the canteen had already rejected his

12   request. (ECF No. 58 ¶ 58; ECF No. 84 at 28 ¶ 5; ECF No. 78 at 3.)

13        On June 14, 2011, he sent a kite to HDSP's medical department asking to be seen for

14   freckles and moles that appeared to be changing. (ECF No. 58 ¶ 64; ECF No. 78 at 3.) A nurse

15   spoke to him outside his cell. (ECF No. 58 ¶¶ 65-66; ECF No. 78 at 3.) On August 7, 2011, he sent

16   another kite asking to see a doctor concerning his skin. (ECF No. 58 ¶ 67; ECF No. 78 at 3.)

17   On September 15, 2011, Plaintiff saw Dr. Hanf, who examined him. (ECF No. 58 ¶ 68; ECF No.

18   84 at 28 ¶¶ 6-7; ECF No. 78 at 3.) According to Plaintiff, he informed Dr. Hanf about having to

19   recreate in coverless cages in the sun without the ability to purchase sunscreen. (ECF No. 84 at 28

20   ¶ 7.) Dr. Hanf told Plaintiff that the lesions on his skin appeared to be benign. (ECF No. 58 ¶ 68;

21   ECF No. 78 at 3.)

22        Plaintiff was transferred to ESP. (ECF No. 58 ¶ 71.) He returned to HDSP on

23   April 10, 2013. (ECF No. 58 ¶ 72.) At that point he noticed one of his moles had turned completely

24   black and that others were changing, so he submitted another kite to HDSP medical in August or

25   September of 2014. (ECF No. 58 ¶¶ 73, ECF No. 78 at 3.) After a nurse and others examined his

26   skin, he was seen by Dr. Holmes, another NDOC physician, on December 23, 2014. (ECF No. 58

27   ¶ 79, ECF No. 78 at 3.) He was seen regarding the mole on his right-side that had turned black,

28   and advised Dr. Holmes about the lesions on his left arm and ear. (ECF No. 58 ¶¶ 79, 80,

1    ECF No. 78 at 3.) Dr. Holmes advised Plaintiff that the lesion on the left ear appeared to be BCC.

2    (ECF No. 58 ¶ 82, ECF No. 78 at 3.) A biopsy was scheduled and postponed. (ECF No. 58 ¶ 85,

3    ECF No. 78 at 3.)

4         Plaintiff submitted his informal grievance (on January 7, 2015). (ECF No. 58 ¶ 86, ECF

5    No. 78-4.) On January 28, 2015, he sent a kite to HDSP medical stating that the moles on his skin

6    were changing color and getting darker. (ECF No. 58 ¶ 87.) He saw Dr. Aranas on

7    February 4, 2015, who scheduled biopsies for the lesions/moles on the right side and left ear, which

8    occurred on February 12, 2015. (ECF No. 58 ¶¶ 88, 89, 92, 93, ECF No. 78 at 4-5.)

9         On March 12, 2015, he was informed the skin lesion on the left ear was in fact BCC. (ECF

10   No. 58 ¶ 95, ECF No. 78 at 5.)

11        **c. Analysis**

12        There are two components to Plaintiff's deliberate indifference claim against Dr. Hanf:

13   (1) the failure to order a biopsy or other testing; and (2) the failure to prescribe sunscreen. The

14   court will address these, in turn.

15        First, the court finds that there is no genuine dispute of material fact with respect to this

16   claim, and Dr. Hanf's decision to not order a biopsy or other testing after examining Plaintiff

17   does not rise to the level of deliberate indifference.

18        Plaintiff was seen by Dr. Hanf on September 15, 2011, for a complaint that he had moles

19   and freckles that appeared to be changing. Dr. Hanf examined him and made a medical decision

20   not to order a biopsy or other testing. Dr. Hanf explains that this is because Plaintiff's complaints

21   related to congenital "moles and freckles," which he describes as "pigmentary lesions" not

22   associated with BCC.

23        More important to the court's analysis though, is the fact that when he examined Plaintiff,

24   he concluded that none of the moles or freckles he presented caused him to suspect BCC. (*Id*.)

25   As such, he advised Plaintiff to continue monitoring his skin for signs of change consistent with

26   "possible melanocytic degradation, i.e. melanoma concerns," and educated him on this. (ECF

27   No. 84 at 35, Dr. Hanf's response to Pl.'s Interrogatory No. 10.)

28        While Plaintiff posits that Dr. Hanf is not a skin specialist qualified to dismiss Plaintiff's

1    skin lesions as benign, he provides *no evidence* in this regard, and fails to refute Dr. Hanf's

2    statement in his response to Plaintiff's interrogatory that his medical knowledge would generally

3    enable him to readily recognize symptoms of BCC or other skin cancers if he were examining a

4    patient complaining of skin lesions. (ECF NO. 84 at 32, Dr. Hanf's response to Pl.'s

5    Interrogatory No. 2.)

6         Dr. Hanf's decision not to order a biopsy or other testing when the lesions Plaintiff

7    complained did not present as warranting further action other than monitoring does not rise to the

8    level of "wanton infliction of pain" that is "repugnant to the conscience of mankind" that the

9    Supreme Court has found proscribed by the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S.

10   97, 106 (1976) (citation and quotation marks omitted).

11        Instead, Plaintiff's claim in this regard is at most a claim for negligence or medical

12   malpractice. "[A] complaint that a physician has been negligent in diagnosing or treatment a

13   medical condition does not state a valid claim of medical mistreatment under the Eighth

14   Amendment. Medical malpractice does not become a constitutional violation merely because the

15   victim is a prisoner." *Id.*

16        In *Estelle*, the plaintiff asserted a claim related to the lack of diagnosis and inadequate

17   treatment of a back injury. *Id*. at 107. The plaintiff claimed more should have been done to

18   diagnose and treat his injury, and highlighted other options that were not pursued. *Id.* The appellate

19   court agreed that an x-ray could have been ordered, or other tests conducted that would have led

20   to the appropriate diagnosis and treatment. *Id.* The Supreme Court did not agree that this amounted

21   to deliberate indifference, and instead found that the case presented "a classic example of a matter

22   for medical judgment." *Id.* "A medical decision not to order an x-ray, or like measures, does not

23   represent cruel and unusual punishment. At most it is medical malpractice[.]" *Id.*

24        Dr. Hanf's decision to not order a biopsy is a similar example of a matter of medical

25   judgment. Therefore, summary judgment should be granted in Dr. Hanf's favor insofar as Plaintiff

26   asserts he was deliberately indifferent in failing to order a biopsy or other testing.

27        Second, the court will address Plaintiff's claim that Dr. Hanf was deliberately indifferent

28   in failing to prescribe him sunscreen.

1        Defendants argue that the failure to prescribe sunscreen does not constitute deliberate

2 indifference because sunscreen is not used to treat changing freckles or moles. This is consistent

3 with the response Dr. Hanf gave to Plaintiff's interrogatory, where he stated he did not prescribe

4 sunscreen because it was not clinically indicated, because the lesions he evaluated were

5 congenital and pigmentary in nature. (ECF No. 84 at 33, response to Pl.'s Interrogatory No. 6.,

6 ECF No. 84 at 34, response to Pl.'s Interrogatory No. 7.) Defendants further argue that Plaintiff

7 does not allege he requested sunscreen.

8        Plaintiff presents evidence, however, that Dr. Hanf knew Plaintiff was a fair-skinned

9 Caucasian male with blonde hair and blue eyes, and that Dr. Hanf concedes that such persons are

10 generally more susceptible to BCC and other skin cancers from sun exposure than those who may

11 not fit that description. (ECF No. 84 at 33, Dr. Hanf's response to Pl.'s Interrogatory No. 3.)

12 Dr. Hanf likewise admits that he knew that sunscreen *may* aid in the prevention of BCC or other

13 skin cancers. (ECF No. 84 at 33, Dr. Hanf's response to Pl.'s Interrogatory No. 3.)

14        Plaintiff states in his affidavit that he told Dr. Hanf that he was forced to recreate outside

15 in a steel cage that did not offer protection from the sun. (Pl.'s Aff., ECF No. 84 at 28 ¶ 7.) Even

16 though Dr. Hanf stated in a response to an interrogatory that when he worked at NDOC, sunscreen

17 was generally available to inmates without the need for a medical order (ECF No. 84 at 34,

18 response to Pl.'s interrogatory No. 7), Plaintiff states in his affidavit that he specifically advised

19 Dr. Hanf he was unable to purchase sunscreen in his ad-seg unit. (Pl.'s Aff., ECF No. 84 at 28

20 ¶ 7.) In a discovery response submitted by Defendants, Plaintiff also stated that he specifically

21 recalled requesting sunscreen from Dr. Hanf. (ECF No. 78-5 at 6, Pl.'s Response to Interrogatory

22 No. 5.)

23        Finally, Plaintiff has presented a supplemental medical opinion from Noel M. Rowan, M.D.

24 (ECF No. 84 at 50-51.) Dr. Rowan states that it is her medical opinion "that the lack of sunscreen

25 deprived Mr. Holden the needed protection from harmful sun rays and therefore contributed to an

26 increased risk of Mr. Holden acquiring basal cell carcinoma." (*Id.*) Defendants presented no

27 objection to Dr. Rowan's supplemental opinion. Their reply brief does not even address the

28 supplemental opinion.

1   A fact-finder, believing Plaintiff's version of events, could come to the conclusion that
2   Dr. Hanf was deliberately indifferent. Dr. Hanf admits Plaintiff was more susceptible to BCC and
3   other skin cancers. According to Plaintiff, he informed Dr. Hanf of changes in his skin, the sun
4   exposure he was getting and his inability to otherwise procure sunscreen. Plaintiff claims he
5   specifically asked Dr. Hanf for sunscreen, to no avail. The fact-finder may also believe the opinion
6   of Dr. Rowan that the lack of sunscreen contributed to an increased risk of Plaintiff acquiring BCC.

7   While Defendants might characterize this as a difference of opinion concerning a course
8   of treatment, Plaintiff has presented facts that, if believed, may demonstrate the course of treatment
9   chosen (not to prescribe sunscreen) was in conscious disregard of an excessive risk to Plaintiff's
10  health, *i.e.*, skin cancer, which we now know became a reality for Plaintiff. *See Snow v. McDaniel*,
11  681 F.3d 978, 988 (9th Cir. 2012) (citation and quotation marks omitted), *overruled on other*
12  *grounds in Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

13  As a result, Defendants' motion for summary judgment should be denied insofar as
14  Plaintiff's deliberate indifference claim in Count IV asserts that Dr. Hanf failed to prescribe him
15  sunscreen.

16  **D. Qualified Immunity**

17  Finally, Defendants argue they are entitled to qualified immunity. Insofar as the argument
18  pertains to the remaining claim in Count IV against Dr. Hanf, they contend that at the time the
19  events occurred, there was no case law that prisoners have a right to a specific form of treatment
20  for skin lesions, i.e., "having the lesions treated with sunscreen, even though sunscreen is not
21  indicated for treatment of skin lesions[.]" (ECF No. 78 at 25:27-28, 26:1.)

22  The qualified immunity analysis consists of two steps: (1) viewing the facts in the light
23  most favorable to the plaintiff, did the defendant violate the plaintiff's rights; and (2) was the right
24  clearly established at the time the defendant acted. *See Castro v. County of Los Angeles*, 833 F.3d
25  1060, 1066 (9th Cir. 2016) (en banc), *cert. denied*, 137 S.Ct. 831 (Jan. 23, 2017).

26  Regarding the first step, the court has already concluded that taking the facts in the light
27  most favorable to the plaintiff, a fact-finder could conclude that Dr. Hanf violated Plaintiff's
28  rights. Regardless of whether the moles and freckles presented caused Dr. Hanf to suspect

Plaintiff then had BCC, Dr. Hanf knew: Plaintiff was more susceptible to skin cancer; about his sun exposure; his inability to procure sunscreen by alternative means; that sunscreen may aid in the prevention of skin cancer; that Plaintiff was complaining of changes in his skin; and, that Plaintiff requested sunscreen. An expert has opined that the lack of sunscreen contributed to an increased risk of Plaintiff acquiring skin cancer. Yet, Dr. Hanf did not prescribe sunscreen.

The question then, is whether the right was clearly established at the time. Whether a right is clearly established turns on the objective reasonableness of the action. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullinex v. Luna*, 136 S.Ct. 305, 308 (2015) (internal citation and quotation marks omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The Supreme Court has made clear, that "'[c]learly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (per curiam) (citing *Ashcroft*, 563 U.S. at 742). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

*White v. Pauly* involved a Fourth Amendment excessive force claim. There, the Supreme Court concluded that the appellate court misunderstood this, as it did not "identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment[,]" and instead relied on "excessive-force principles at only a general level." *Id*. "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, …, but in light of pre-existing law the unlawfulness must be apparent[.]" *White*, 137 S.Ct. at 552. *White*, the Supreme Court said, did not involve a "run-of-the-mill Fourth Amendment violation," but presented a "unique set of circumstances" so that the constitutional violation was not readily apparent. *Id*.

The Ninth Circuit noted "the Supreme Court's recent frustration" with the appellate courts, and the Ninth Circuit in particular, in defining clearly established law "at a high level of generality." *S.B. v. County of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017) (citing *City &*

*County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1775-76 (2015)). The Ninth Circuit stated that it "hear[d] the Supreme Court loud and clear," indicating that to impose liability on the defendant it had to identify precedent as of the time of the conduct in question that put the defendant on notice that his conduct in the particular circumstances violated the Constitution. *Id*. The Ninth Circuit described the clearly established law standard echoed in *White* as "exacting." *Id*.

There are many cases, indeed many Supreme Court cases, discussing what level of particularity is appropriate in the Fourth Amendment context. *S.B.* was also a Fourth Amendment case.  The Ninth Circuit pointed out in *S.B.* that the need to "particularize" the law to the facts of the case is especially important in the Fourth Amendment context, "where [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *S.B.*, 864 F.3d at 1015 (9th Cir. 2017) (internal quotation marks and citation omitted). Still, neither the Supreme Court nor the Ninth Circuit has specifically discussed, post-*White v. Pauly*, what level of factual similarity is required in the context of an inmate asserting an Eighth Amendment claim that a prison official was deliberately indifferent to his serious medical needs.

Defendants posit that Dr. Hanf is entitled to qualified immunity because there was no specific ruling indicating a prisoner had a right to have lesions treated with sunscreen. The court must assess whether this much particularity is required, or whether Dr. Hanf was sufficiently on notice that his conduct violated Plaintiff's rights.

Preliminarily, the court points out that Dr. Hanf's position that there was no clearly established law requires the court to accept Dr. Hanf's version of the facts, *i.e.*, that sunscreen would not have treated his moles and freckles; that he did not seek treatment for sunburn; and, that he did not request sunscreen. The court finds, however, that if the Plaintiff's version of the facts is believed, the law was clearly established that Dr. Hanf's conduct would violate the Constitution.

It has long been established that prison officials may not be deliberately indifferent to the serious medical needs of prisoners, which may be "manifested by prison doctors in their

1    response to the prisoner's needs[.]" *Estelle*, 429 U.S. at 104. Prison officials cannot intentionally

2    deny or delay access to medical care. *Id.* at 104-05. It was also well established that a prison

3    official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate

4    health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). On the other hand, the "failure

5    to alleviate a significant risk that he should have perceived but did not, while no cause for

6    commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at

7    838. In addition, there is no liability if a prison official knows of a substantial risk to an inmate's

8    health but responds reasonable, "even if the harm ultimately was not averted." *Id.* at 844. The

9    Ninth Circuit has stated that "[i]t is well settled law that deliberate indifference to serious

10   medical needs of prisoners violates the Eighth Amendment." *Jackson v. McIntosh*, 90 F.3d 330,

11   332 (9th Cir. 1996). The court does not view this as a case requiring any further level of

12   particularity.

13       Here, believing Plaintiff's version of events, Dr. Hanf knew Plaintiff was more

14   susceptible to skin cancer, was being exposed to the sun regularly, was complaining of changes

15   in his skin, could not otherwise procedure sunscreen, and specifically requested sunscreen. Dr.

16   Hanf admits that sunscreen may aid to prevent skin cancer, and there is opinion testimony this

17   contributed to Plaintiff's risk of acquiring skin cancer. Yet, he did not prescribe any sunscreen.

18   When compared to the Fourth Amendment context, it might seem like reliance on *Estelle* and

19   *Farmer v. Brennan* is defining the law too generally, but in the court's review no further factual

20   particularity is required under this circumstance. This case is not so unique that a case discussing

21   exactly the same facts is necessary. Instead, the law was clearly established that if a prison doctor

22   knew of an excessive risk to an inmate's health, but disregarded that risk, the doctor violates the

23   Eighth Amendment.

24       Accordingly, the court finds the motion should be denied insofar as it requests a finding

25   Dr. Hanf is entitled to qualified immunity.

26       Dr. Hanf is free to renew the request for qualified immunity if a fact-finder accepts a

27   different version of events at trial that either establishes there was no constitutional violation, or

28   that given the set of facts that are accepted, the law in such a case would not have put Dr. Hanf

1    on notice that his conduct violated the Constitution.

2    **E. Conclusion**

3    In sum, the only remaining claim proceeding if the recommendations set forth herein are

4    accepted is Plaintiff's claim in Count IV that Dr. Hanf was deliberately indifferent to his serious

5    medical needs under the Eighth Amendment of the United States Constitution and under Article I,

6    section 6 of the Nevada Constitution, when he failed to prescribe sunscreen.

7    ### III. RECOMMENDATION

8    IT IS HEREBY RECOMMENDED that the District Judge enter an order:

9    (1) **DISMISSING WITHOUT PREJUDICE** Dr. Holmes as Plaintiff has not served him

10   with the SAC, unless Plaintiff files, within **fourteen days** of any order adopting and accepting this

11   Report and Recommendation a filing demonstrating good cause for failing to timely serve Dr.

12   Holmes that justifies an extension of the service deadline;

13   (2) **GRANTING** Defendants' motion for summary judgment on the basis that Plaintiff

14   failed to exhaust his administrative remedies with respect to Counts I, II, III, VI, VII, and VIII;

15   (3) **DENYING** Defendants' motion for summary judgment on the basis that Plaintiff failed

16   to exhaust his administrative remedies with respect to Count IV against Dr. Hanf;

17   (4) **DENYING** Defendants' motion for summary judgment on the basis that Plaintiff failed

18   to exhaust his administrative remedies with respect to Count V against Dr. Holmes as he has not

19   been served with the SAC;

20   (5) **GRANTING** Defendants' motion for summary judgment insofar as Plaintiff asserts a

21   claim of deliberate indifference under the Eighth Amendment of the United States Constitution

22   and Article I, section 6 of the Nevada Constitution against Dr. Hanf in Count IV, predicated on

23   Dr. Hanf's alleged failure to order a biopsy or other testing;

24   (6) **DENYING** Defendants' motion for summary judgment insofar as Plaintiff asserts a

25   claim of deliberate indifference under the Eighth Amendment of the United States Constitution

26   and Article I, section 6 of the Nevada Constitution against Dr. Hanf in Count IV, predicated on

27   Dr. Hanf's alleged failure to prescribe sunscreen; and

28   (7) **DENYING** Defendants' motion insofar as it argues they are entitled to qualified

immunity.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: August 17, 2018

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE